<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ONYX ENTERPRISES CANADA, INC., <br><br> Plaintiff, <br><br> v. <br><br> STANISLAV ROYZENSHTEYN, *et al.*, <br><br> Defendants. | Civil Action No. 23-02913 (GC) (JBD) <br><br> **<u>OPINION</u>** |

<u>**CASTNER, District Judge**</u>

**THIS MATTER** comes before the Court upon two Motions to Dismiss Plaintiff Onyx Enterprises Canada, Inc.'s ("OEC's") First Amended Complaint (ECF No. 6): the first filed by Defendants Stanislav Royzenshteyn and Roman Gerashenko (ECF No. 61), and the second filed by Defendants Daniel Ginzburg and the Ginzburg Law Firm, P.C. (the "Ginzburg Defendants") (ECF No. 62). OEC opposed, and Defendants replied. (ECF Nos. 63-65, 67.) The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' Motions are **GRANTED** in part and **DENIED** in part.

I.    **<u>BACKGROUND</u>**

**A. The 2015 Transaction Between OEC and Onyx**

In 2008, Royzenshteyn and Gerashenko founded Onyx Enterprises Int'l, Inc. ("Onyx"), an online distributor of motor vehicle-related parts. By early 2014, Onyx was at risk of insolvency and engaged an investment firm to find potential investors. That search led Onyx to Prashant

Pathak, the owner of the Canadian private equity firm Ekagrata, Inc., who sought to invest in Onyx. Pathak later introduced Royzenshteyn and Gerashenko to Carey Kurtin, another partner in the investment. After a series of negotiations, Pathak and Kurtin formed Plaintiff OEC as a vehicle to invest $5 million in Onyx (the "2015 Transaction"). (ECF No. 6 ¶¶ 15, 16, 19, 20, 22.)[1]

The terms of the 2015 Transaction are memorialized in five contracts: the Stockholders Agreement, the Investor Rights Agreement, the Stock Purchase Agreement, the Security Agreement, and the Warrant to Purchase Common Stock. Each agreement is dated July 17, 2015. In addition to these agreements, Onyx amended its Certificate of Incorporation ("COI") and Bylaws. As part of the 2015 Transaction, OEC acquired a 52% ownership interest in Onyx. The agreements also specified that Onyx's Board of Directors would consist of four members: one designee each from Royzenshteyn and Gerashenko, and two designees from OEC. OEC appointed Pathak and Kurtin, and Royzenshteyn and Gerashenko appointed themselves. Additionally, Onyx issued a total of one million shares of Series A Preferred Stock and 417 shares of Common Stock to OEC, and Royzenshteyn and Gerashenko each held 100 shares of Common Stock. (*Id.* ¶¶ 1, 15, 19, 20, 22, 24, 26-28.)

OEC focuses its allegations on several key provisions in these agreements. The Stockholders Agreement set a priority order for distributions from Onyx. This provision, in relevant part, provided that Onyx must distribute "all available cash," if there were "reasonable reserves as determined by the Board," first to OEC "on a monthly basis, in an amount equal to the accrued and unpaid Accruing Dividend," then to "the payment of corporate taxes and any other amounts owing governmental authorities," then to "pay the costs of critical growth priorities of

---

[1]     Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

the Company's business (as determined by the Board . . . )," and then to "pay any accrued and unpaid Performance Bonus [to Royzenshteyn and Gerashenko]." (*Id.* ¶¶ 35-37 (internal quotation marks omitted).)

The Investor Rights Agreement prohibited Onyx from "[i]ncreas[ing] or mak[ing] other changes" to salaries of Onyx's executives and employees unless "previously approved by [OEC]." (*Id.* ¶ 38 (internal quotation marks omitted).)

The COI permitted OEC, as holder of the Series A Preferred shares, to "require the Company . . . to redeem all of the then-outstanding shares of Series A Preferred held by such holder by delivering written notice to the Company (the 'Redemption Notice')" if Onyx (1) fails "to pay, when due, any Accruing Dividends," (2) fails "to substantially comply with any of its other material obligations to any holder of Series A Preferred" under any agreement with Onyx, or (3) "ceases to be solvent or fails generally to pay its debts as they become due." (*Id.* ¶ 39 (internal quotation marks omitted).)

The COI also required Onyx to pay the "Demand Redemption Price" once the Redemption Request was issued "in an amount equal to the sum of (i) four (4) times the Original Issue Price plus (ii) any accrued but unpaid Accruing Dividends," known as the "Liquidation Preference." The holder of preferred shares, OEC, was also entitled to payment of the Liquidation Preference in the event of an acquisition or "Liquidation Event" under the COI. (*Id.* ¶¶ 40, 46-48 (internal quotation marks omitted).)

A failure to pay an amount equal to the Liquidation Preference after receipt of the Redemption Request constituted an "Event of Default" under the Security Agreement. If an "Event of Default" occurred, the Security Agreement allowed OEC to "sell, lease, license or otherwise dispose of any or all Collateral," "take immediate possession of the Collateral covered

hereby and without notice or consent by [Onyx]," and "with regard to any Deposit Account, instruct the bank . . . to pay the balance . . . to [OEC] or take such other action as [OEC] shall instruct."[2] (*Id.* ¶¶ 42-43 (internal quotation marks omitted).)

Finally, if OEC accepted an offer for sale of Onyx "for a purchase price of at least $45,000,000," OEC was required to give written notice to Onyx and Royzenshteyn and Gerashenko (a "Drag Notice"), upon receipt of which Royzenshteyn and Gerashenko must sell all of their stock to the offeror. (*Id.* ¶ 49 (internal quotation marks omitted).)

### B. Defendants' Alleged Conduct Leading Up to Onyx's 2020 Merger with Legacy

After the 2015 Transaction and the execution of these agreements, OEC alleges that Royzenshteyn and Gerashenko almost immediately began to engage in a "continuous and escalating series" of self-interested and "disruptive" actions aimed at depriving OEC of its rights and benefits as the holder of preferred shares and majority shareholder of Onyx. Among the self-dealing actions alleged are Royzenshteyn and Gerashenko's demands for "drastically disproportionate increases" to their salaries "to the exclusion of nearly all other business"; their sabotage of business and investment opportunities to build leverage for those compensation demands (including stalling a technology audit related to a Pep Boys partnership, refusing a "kickoff" meeting regarding a potential engagement with the Royal Bank of Canada, and behaving rudely to an executive from Saleen Automotive regarding a partnership deal); their use of corporate credit cards to finance personal charges such as "personal meals, strip clubs, lodging, [] personal effects, including underwear, . . . [and] luxury cars or boats"; their withdrawal of $3 million from Onyx to pay their Performance Bonuses, the term for which had expired; and their refusal to

---

[2]    The Security Agreement defines "Collateral" to include "Proceeds, Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, General Intangibles, Goods (including Equipment and Fixtures), Instruments, Inventory, Investment Property, Letters of Credit and Letter-of-Credit Rights." (ECF No. 6 ¶ 43 n.23.)

provide access to Onyx's books and records to Pathak and Kurtin. (*Id.* ¶¶ 55-56, 61, 73, 88, 103, 105, 108-110, 116, 120, 129-130, 132, 147-148, 152.)

In addition to these alleged self-interested actions, OEC asserts that Royzenshteyn and Gerashenko enlisted the help of the Ginzburg Defendants in unwinding the 2015 Transaction. In or around September 2016, Royzenshteyn and Gerashenko sought advice from the Ginzburg Defendants to advise them individually regarding compensation negotiations as well as potential avenues to part ways with OEC or reduce OEC's power over Onyx. OEC claims that the Ginzburg Defendants billed and were paid by Onyx for the advice provided to Royzenshteyn and Gerashenko. According to OEC, in 2016 and 2017, the Ginzburg Defendants were also engaged to represent Onyx in a separate litigation matter as well as advising Onyx regarding non-competition covenants. OEC claims that in connection with the Ginzburg Defendants' review of the 2015 Transaction documents on behalf of Royzenshteyn and Gerashenko, Defendant Daniel Ginzburg relied on confidential materials obtained during his representation of Onyx on other matters. OEC alleges that during this time, the Ginzburg Defendants did not obtain a conflict waiver from Onyx, did not properly inform Onyx of their representation of Royzenshteyn and Gerashenko, and did not receive approval from any non-conflicted officers or directors of Onyx to represent Royzenshteyn and Gerashenko. (*Id.* ¶¶ 59-64, 153, 157-163, 165.)

In March 2018, the Ginzburg Defendants filed a fraud action on behalf of Royzenshteyn and Gerashenko in New Jersey Superior Court, Monmouth County, Chancery Division, against Onyx, OEC, Pathak, and Kurtin, as well as other defendants, arising from the 2015 Transaction (the "State Court Litigation"). Onyx obtained separate legal counsel to represent it in the State Court Litigation. That action remains pending. As the State Court Litigation proceeded, Onyx's four-member Board became "deadlocked." The judge in the State Court Litigation appointed a

fifth, provisional Board member, Kailas Agrawal, Onyx's Chief Financial Officer, to which Royzenshteyn and Gerashenko allegedly agreed.  But the Ginzburg Defendants, on behalf of Royzenshteyn and Gerashenko, later sought in the State Court Litigation to remove Agrawal as provisional director.  (*Id.* ¶¶ 66, 69, 176, 178, 179, 183, 190.)

In December 2018, the Onyx Board passed a resolution to terminate Gerashenko as Chief Executive Officer ("CEO") and appointed Royzenshteyn as his successor.  The Board terminated Gerashenko because he "failed to create an executive team and create adequate documentation for the software running Onyx's e-commerce platform"; charged "outlandish" and "outrageous" amounts on corporate credit cards, including $12,699 in travel expenses in 2019; and acted "erratically and unprofessionally" toward Onyx's Board members and employees.  (*Id.* ¶¶ 185, 189.)

By February 2020, Onyx was declining financially.  Around this time, OEC alleges that the Ginzburg Defendants, as part of the overall strategy in the State Court Litigation, advised Royzenshteyn and Gerashenko to obstruct OEC's attempts to pursue investment or acquisition opportunities for Onyx, including objecting to the sale of Onyx to Wheel Pros, LLC/Clearlake Capital ("Clearlake").  By the end of March 2020, Onyx was insolvent.  OEC alleges that Onyx's insolvency was due to Royzenshteyn and Gerashenko's prior mismanagement of the business and the "utter failure" of Onyx's current management to prepare its e-commerce platform for the COVID-19 pandemic.  (*Id.* ¶¶ 190, 208, 214-217.)

Due to its insolvency, Onyx allegedly defaulted on various contractual obligations to OEC under the agreements executed in the 2015 Transaction.  Onyx suspended the distribution of Accruing Dividends on OEC's preferred shares, which totaled about $50,000 per month.  OEC subsequently issued a Redemption Notice under the terms of the COI, demanding redemption of

1,000,000 Series A Preferred Shares, including the Liquidation Preference. According to OEC, Royzenshteyn did not immediately redeem those shares, constituting a default event under the Security Agreement. In accordance with its rights under the Security Agreement, OEC sent notices to each bank, "notifying the bank that Onyx was in default and directing each bank to terminate the Company's access to the accounts." OEC did not withdraw from these accounts the full amount to which it was entitled under the COI and Security Agreement and sought, instead, to negotiate a forbearance agreement to protect Onyx and OEC's interests. But Royzenshteyn allegedly refused to negotiate and, through the Ginzburg Defendants, filed an emergency Temporary Restraining Order ("TRO") request in the State Court Litigation against OEC exercising its rights under the COI and Security Agreement. (*Id.* ¶¶ 214-229.)

In July 2020, Royzenshteyn voluntarily resigned as CEO, but, before doing so, he paid himself an additional $400,000. OEC alleges that the Ginzburg Defendants advised Royzenshteyn to misappropriate these funds to help fund the State Court Litigation. (*Id.* ¶¶ 234-235.)

That same month, Canaccord Genuity, an investment bank engaged by Onyx to seek out potential investors and acquisition partners, identified Legacy Acquisition Corp. ("Legacy"), a special acquisition corporation ("SPAC"), as a potential merger partner with Onyx. Legacy's proposed deal valued Onyx at $175 to $275 million and would result in Onyx becoming a public company. Royzenshteyn and Gerashenko opposed the transaction, seeking to remove Agrawal from the Board and to enjoin the proposed merger. Ultimately, that attempt was unsuccessful. OEC also claims that Royzenshteyn and Gerashenko contacted several of Legacy's investors, informing them that the proposed transaction would be unwound by the State Court Litigation. After the Board voted to approve the proposed merger, over Royzenshteyn and Gerashenko's objection, they and the Ginzburg Defendants again sought to enjoin the merger in the State Court

Litigation.  The state court denied their request, and the merger closed on November 20, 2020.  (*Id*. ¶¶ 197, 238, 240, 242, 248, 252, 254, 256-257, 263.)

The final key terms of Onyx's 2020 merger with Legacy were as follows: (1) "[t]he valuation of Onyx was $260 million, plus additional consideration for the cash in Onyx's coffers"; (2) "[t]he holders of the Series A Preferred Shares were paid $9 million in cash, and the remainder of the Liquidation Preference was paid in shares of the surviving entity"; (3) "[t]he holders of Onyx Common Stock surrendered their Stock in Onyx in exchange for shares in the surviving entity on a pro rata basis per the final valuation of Onyx."  (*Id*. ¶ 264.)

### C.  Procedural History

On August 21, 2023, OEC brought this action in federal court[3] based on diversity jurisdiction against Royzenshteyn and Gerashenko, as former directors and officers of Onyx, and the Ginzburg Defendants, as counsel for Royzenshteyn and Gerashenko in the State Court Litigation.[4]

On July 12, 2023, OEC filed the Amended Complaint.  (ECF No. 6.)  OEC brings 13 claims: four breach of fiduciary duty claims against Royzenshteyn and Gerashenko as former directors and officers of Onyx (Counts I, II, III, IV); two claims for breaches of the various contracts governing the 2015 Transaction against Royzenshteyn and Gerashenko (Counts V and VI); a claim for breach of the implied covenant of good faith and fair dealing against Royzenshteyn and Gerashenko (Count VII); three claims for tortious interference with the various contracts governing the 2015 Transaction against all Defendants (Counts VIII, IX, and X); a civil conspiracy

---

[3]    The parties in this case are involved in another federal action before this Court, which Royzenshteyn and Gerashenko brought against OEC as well as other defendants in 2022, arising from the 2020 merger between Onyx and Legacy. *See Royzenshteyn v. Onyx Enterprises Canada, Inc.*, Civ. No. 22-7514 (D.N.J. Dec. 27, 2022).

[4]    The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

claim against all Defendants (Count XI); a claim for aiding and abetting the breaches of fiduciary duty, breaches of contract, and tortious interference against all Defendants (Count XII); and a prima facie tort claim against all Defendants (Count XIII).  (*Id.* ¶¶ 277-421.)

Following an unsuccessful mediation in March 2024, Royzenshteyn and Gerashenko and the Ginzburg Defendants filed the pending Motions to Dismiss on June 12, 2024.  (ECF Nos. 58, 61, 62.)

## II.   LEGAL STANDARD

### A.    Rule 12(b)(1): Lack of Subject-Matter Jurisdiction

Rule 12(b)(1) permits a defendant to move at any time to dismiss the complaint for lack of subject-matter jurisdiction on either facial or factual grounds.  *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction."  *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999).  In analyzing a facial challenge, a court "must only consider the allegations of the complaint and documents attached thereto, in the light most favorable to the plaintiff."  *Gould Elec. Inc.*, 220 F.3d at 176.  "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists."  *Arosa Solar Energy Sys., Inc. v. Solar*, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. Mar. 30, 2021).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts."  *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).  The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist."  *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d

884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. Regardless of the type of challenge, the plaintiff bears the "burden of proving that the court has subject matter jurisdiction." *Cottrell v. Heritages Dairy Stores, Inc.*, Civ. No. 09-1743, 2010 WL 3908567, at *2 (D.N.J. Sep. 30, 2010) (citing *Mortensen*, 549 F.2d at 891).

**B. Rule 12(b)(6): Failure to State a Claim Upon Which Relief Can Be Granted**

On a motion to dismiss for failure to state a claim, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

**III.    DISCUSSION**

Defendants raise numerous grounds for dismissing the claims against them. *First*, the Court must construe OEC's breach of fiduciary duty claims as derivative because OEC has failed

to plead "special injury" and is, alternatively, judicially estopped from pursuing direct breach of fiduciary duty claims in this action when OEC brought those same claims under a derivative theory in the State Court Litigation.  *Second*, Royzenshteyn and Gerashenko are shielded from liability for breaches of fiduciary duty by the business judgment rule.  *Third*, Delaware's three-year statute of limitations bars OEC's breach of contract claims.  *Fourth*, to the extent that OEC's claims against Defendants rely on their legitimate use of the litigation process, the litigation privilege bars all such claims.  *Fifth*, the Court should dismiss OEC's claims for tortious interference with various contracts against the Ginzburg Defendants because OEC has failed to plead that the Ginzburg Defendants acted with malice, that they proximately caused OEC's harm, and that OEC suffered damages.  *Sixth*, OEC's civil conspiracy claim against the Ginzburg Defendants must fail because the Ginzburg Defendants cannot conspire with their own clients and OEC has not pled concerted action to commit an unlawful act.  *Seventh*, an aiding and abetting claim arising from a breach of contract does not exist.  Finally, OEC's prima facie tort claim is not recognized under New Jersey law.

The Court will address each argument in turn.

## A.    Direct or Derivative Claims

Rozenshteyn and Gerashenko argue that OEC has failed to plead "special injury," and, therefore, cannot pursue direct claims against them for breach of fiduciary duty.  (ECF No. 61-1 at 25-27.)  The direct or derivative nature of a shareholder suit is a threshold standing issue.  *See Tully v. Mirz*, 198 A.3d 295, 301-03 (N.J. Super. Ct. App. Div. 2018) (reviewing a trial court's ruling that a plaintiff lacked standing to bring a derivative suit).[5]  To determine whether OEC's claims are direct or derivative, the Court must analyze the "nature of the wrongs alleged" in the

---

[5]    The parties do not dispute that New Jersey law applies to the question of whether OEC's claims are direct or directive.  (ECF No. 61-1 at 25 n.8, 25-27; ECF No. 63 at 27-28.)

Amended Complaint, "not the plaintiff's designation or stated intention." *Id.* at 301. The distinction between direct and derivative claims is "important because derivative actions are deemed to belong to the subject corporation whereas individual actions do not." *Strasenburgh v. Straubmuller*, 683 A.2d 818, 829 (N.J. 1996) ("The distinction between the two types of action is crucial.").

"Claims of breach of fiduciary duty on the part of directors will [] be generally regarded as derivative claims unless the injury to shares is distinct." *Id*. at 830. New Jersey law permits a shareholder to maintain a direct action for breach of fiduciary duty against a corporation or its directors "if the shareholder suffers a 'special injury.'" *Tully*, 198 A.3d at 301. "A special injury exists 'where there is a wrong suffered by [the] plaintiff that was not suffered by all stockholders generally or where the wrong involves a contractual right of the stockholders, such as the right to vote.'" *Id.* (quoting *Strasenburgh*, 683 A.2d at 829).

The Amended Complaint is replete with allegations that Royzenshteyn and Gerashenko's "self-interested" actions harmed Onyx and its shareholders generally. (*See* ECF No. 6 ¶ 56 (alleging that Royzenshteyn and Gerashenko "use[d] their power as officers of Onyx to misappropriate Onyx's assets for their own benefit in direct derogation of their duties of loyalty to Onyx and its shareholders, including OEC"); ¶¶ 78-81 (alleging that Royzenshteyn and Gerashenko funded their "lavish lifestyle[s] at the expense of Onyx," "loot[ed] Onyx," and "use[d] Onyx as their personal piggy bank"); ¶ 96 ("Royzenshteyn and Gerashenko were only concerned about their own officer compensation, disregarding Onyx's business interests"); ¶ 101 (detailing Pathak's "concerns" that "Royzenshteyn and Gerashenko's 'narrow priorities of management are interfering' with Onyx's business"); ¶¶ 105-131 (alleging that Royzenshteyn and Gerashenko held Onyx "hostage" as leverage for their "self-interested compensation negotiations" by "sabotaging"

various investment opportunities); ¶¶ 150-151 (alleging that Royzenshteyn and Gerashenko "misappropriated" $3 million of "Onyx funds" and prevented Onyx from acquiring the "internet domain 'ID.com'" in "violation of their duties to Onyx and its shareholders"); ¶¶ 211-213 (asserting that Royzenshteyn and Gerashenko interfered with the sale of Onyx by refusing to negotiate a settlement in the State Court Litigation despite "their duties of care and loyalty, to make reasonable business decisions based on a fair exercise of their informed business judgment to resolve the matter for Onyx's benefit."); ¶ 247 ("Under their fiduciary duties, Royzenshteyn and Gerashenko . . . had a duty to Onyx and its stockholders to exercise their informed business judgment to vote for or against the proposed transaction in Onyx's best interest and that of all its stockholders."); ¶¶ 248-249 (alleging that Royzenshteyn and Gerashenko opposed the 2020 merger because "personal enrichment" was their priority, "to the derogation of Onyx's best interests and those of its shareholders.".)

OEC alleges that these "self-interested" actions caused Onyx to become insolvent in early 2020 and to lose out on certain acquisition opportunities, which, in turn, harmed OEC in various ways as the preferred shareholder. (*Id.* ¶¶ 286, 297, 312, 326.) But, as pled, the harm caused by Royzenshteyn and Gerashenko's alleged self-dealing, wasteful spending, and mismanagement was felt most directly by Onyx. *See In re Sunrise Sec. Litig.*, 916 F.2d 874, 877-78 (3d Cir. 1990) (stating that "plaintiffs could not recover on the theory that defendants' mismanagement caused the insolvency of either Old or New Sunrise because such a claim was derivative"); *In re D'Amore*, 472 B.R. 679, 694-95 (Bankr. D.N.J. 2012) (concluding that plaintiffs' claims for "misappropriation of corporate funds and usurpation of corporate opportunities are distinct corporate causes of action, and do not give rise to an independent shareholder action"); *Pullman-Peabody Co. v. Joy Mfg. Co.*, 662 F. Supp. 32, 35 (D.N.J. 1986) ("Claims of breach of fiduciary

duty and of corporate waste are facially claims of injury to the corporation and clearly not individual bases for litigation.  Suits challenging alleged mismanagement must be brought as derivative actions."); *Cajoeco LLC v. Bensi Enters., LLC*, 2021 WL 2472382, at *11 (N.J. Super. Ct. App. Div. June 17, 2021) (noting that "the claims of corporate waste and self-dealing were shareholder derivative claims that could not be pursued by plaintiffs individually"); *Tully*, 198 A.3d at 302 (finding that a shareholder's claims against a co-shareholder for mismanagement, conversion, and fraud, as related to their closely-held corporation, were derivative claims); *see also Strasenburgh*, 683 A.2d at 830-31 (discussing several examples of derivative actions, including a case in which preferred shareholders were found not to have suffered distinct harm in the switching of assets from one airline to another (citing *Weinberger v. Lorenzo*, 1990 WL 156529, at *1 (Del. Ch. Oct. 12, 1990))).

Because OEC's alleged injuries flow from the direct harms to Onyx, the Court construes OEC's breach of fiduciary duty claims as derivative.  *See In re Sunrise Sec. Litig.*, 916 F.2d at 879 (finding that the plaintiffs could bring only a derivative claim because, "[e]ven if plaintiffs' losses could be traced to defendants' alleged misconduct, in substance, the complaint states a claim for injury to [the company] and it is from this injury that plaintiffs' losses flowed").

Royzenshteyn and Gerashenko do not challenge the direct nature of OEC's breach of contract claims.  (ECF No. 67 at 12.)  And it agrees that OEC has pled direct harm in support of those claims, separate from the "self-interested" actions identified above.  Specifically, OEC pleads that Onyx, at the hands of its management, defaulted on various contractual obligations under the agreements it executed in the 2015 Transaction, causing OEC direct harm.  (*See* ECF No. 6 ¶¶ 214-229.)  For example, OEC asserts that in the face of "declining financial forecasts," Onyx suspended the distribution of "Accruing Dividends on OEC's Class A Preferred Shares,

which totaled approximately $50,000 per month." (*Id*. ¶ 214.)  In addition, OEC alleges that Onyx's management "utterly failed to prepare their ecommerce platform" for the COVID-19 pandemic and, by the end of March 2020, Onyx was "technically insolvent." (*Id*. ¶¶ 216-217.) Due to this insolvency, OEC alleges that it issued a Redemption Notice under the terms of the Restated COI, demanding redemption of 1,000,000 Series A Preferred Shares, including the Liquidation Preference.  (*Id*. ¶¶ 219-220.)  According to OEC, Royzenshteyn did not immediately redeem those shares, constituting a default event under the Security Agreement.  (*Id*. ¶ 224.)  In accordance with its rights under the Security Agreement, OEC alleges that it sent notices to each bank, "notifying the bank that Onyx was in default and directing each bank to terminate the Company's access to the accounts." (*Id*. ¶ 225.)  Instead of discussing a forbearance agreement at OEC's suggestion, Royzenshteyn allegedly refused to negotiate and, through the Ginzburg Defendants, filed an emergency TRO request in the State Court Litigation against OEC exercising its rights under the COI and Security Agreement.  (*Id*. ¶¶ 226-227.)  These alleged contractual breaches caused OEC distinct harm.  Therefore, OEC may pursue their breach of contract claims under a direct theory of harm.

Because the Court concludes that OEC's breach of fiduciary duty claims are derivative in nature, OEC must comply with the pleading requirements of Rule 23.1 of the Federal Rules of Civil Procedure.  To satisfy those requirements, OEC must plead the following: (1) "plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on it by operation of law"; (2) "the action is not a collusive one to confer jurisdiction that the court would otherwise lack"; and (3) "state with particularity (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action

15

or not making the effort." Fed. R. Civ. P. 23.1(a)(1)-(3).  OEC has failed to plead the second and

third requirements of Rule 23.1.  (*See generally* ECF No. 6.)  Accordingly, the Court will dismiss

Counts I through IV without prejudice.[6] [7]

---

[6]    Royzenshteyn and Gerashenko raise two alternative grounds on which they seek to dismiss OEC's breach of fiduciary duty claims—judicial estoppel and the business judgment rule.  The Court declines at this time to address these issues as it has already dismissed without prejudice OEC's breach of fiduciary duty claims.

[7]    Although the Court dismisses without prejudice OEC's derivative fiduciary duty claims, *res judicata* may also bar them.  Under New Jersey law, *res judicata* applies when: (1) the judgment in the prior action is valid, final, and on the merits; (2) the parties in the later action are identical to or in privity with those in the prior action; and (3) the claim in the later action grows out of the same transaction or occurrence as the claim in the earlier one.  *Ezekwo v. Caliber Home Loans, Inc.*, Civ. No. 20-16187, 2021 WL 2390053, at *4 (D.N.J. June 11, 2021) (citing *Watkins v. Resorts Int'l Hotel & Casino, Inc.*, 591 A.2d 592, 599 (N.J. 1991)).  "If given preclusive effect, the prior judgment will bar not only the matters actually determined in the previous proceedings, but also all claims that could have been raised in the first action."  *Bondi v. Citigroup, Inc.*, 32 A.3d 1158, 1185 (NJ. Super. Ct. App. Div. 2011).  OEC filed derivative breach of fiduciary duty counterclaims against Royzenshteyn and Gerashenko in the State Court Litigation, arising from Royzenshteyn and Gerashenko's alleged self-interested actions and mismanagement of Onyx following the 2015 Transaction.  OEC's Answer and Countercl. at 46-81, *Royzenshteyn v. Onyx Enter. Canada, Inc.*, No. C-45-18 (N.J. Super. Ct. Ch. Div. July 7, 2019).  The state court dismissed those derivative claims with prejudice in 2021 before this action commenced.  Order Dismissing Countercl., *Royzenshteyn v. Onyx Enter. Canada, Inc.*, No. C-45-18 (N.J. Super. Ct. Ch. Div. Dec. 17, 2021).  Although Royzenshteyn and Gerashenko previewed *res judicata* as a basis for dismissal in their pre-motion letter to this Court, they have seemingly abandoned this defense due to a potential appeal of the state court's final judgment.  (ECF No. 61-1 at 24 n.6.)  However, "a pending appeal does not vitiate the preclusive effect of a trial court judgment."  *See Kokinda v. Pa. Dep't of Corr.*, 803 F. App'x 574, 577 (3d Cir. 2020) (citing *United States v. 5 Unlabeled Boxes*, 572 F.3d 169, 175 (3d Cir. 2009)); *Shaikh v. Akrush*, Civ. No. 19-20597, 2024 WL 112530, at *3 n.5 (D.N.J. Jan. 10, 2024) ("However, the pending appeal does not alter the preclusive effect of the Court's final judgment." (internal quotation marks omitted)); *Stewart v. Brennan*, Civ. No. 19-14923, 2020 WL 2060281, at *2 (D.N.J. Apr. 29, 2020) (same); *Stahl v. Twp. of Montclair*, Civ. No. 12-3244, 2013 WL 1867036, at *2 (D.N.J. May 2, 2013) (same); *see also* C. Wright, A. Miller & E. Cooper, 18A Federal Practice and Procedure: Jurisdiction § 4427 ("[I]t has become clear in the federal courts that res judicata ordinarily attaches to a final lower court judgment even though an appeal has been taken and remains undecided."); C. Wright, A. Miller & E. Cooper, 18A Federal Practice and Procedure: Jurisdiction § 4433 ("The determination that the first judgment supports res judicata in another action does not resolve any of the issues properly presented on appeal from the first judgment—indeed, res judicata does not depend on the correctness of the judgment.").

###### B.    Statute of Limitations

Although Royzenshteyn and Gerashenko agree that OEC can pursue direct claims for breach of contract, they contend that Delaware's statute of limitations—three years—bars those claims to the extent that they rely on the Stockholders Agreement, the Investor Rights Agreement, and the Stock Purchase Agreement.  (ECF No. 61-1 at 39-42.)[8]  OEC argues that New Jersey's statute of limitations—six years—applies to these agreements and, therefore, spares from dismissal any such contract claims.  (ECF No. 63 at 42-46.)  Whether OEC's breach of contract claims as to these three agreements are time-barred depends on which state's statute of limitations applies.

A federal court sitting in diversity applies the choice-of-law rules of the state in which it is located—here, New Jersey.  *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017).  New Jersey applies the test set forth in Section 142 of the Restatement (Second) Conflict of Laws when seeking to resolve choice-of-law determinations involving statutes of limitations.  *McCarrell v. Hoffman-La Roche, Inc.*, 153 A.3d 207, 210 (N.J. 2017).  Under that section, "the statute of limitations of the forum state . . . applies if that state has a substantial interest in the maintenance of the claim and there are no 'exceptional circumstances' that 'make such result unreasonable.'" *Id.*

However, when contracting parties have agreed to a private choice-of-law clause, New Jersey will give effect to that clause unless it conflicts with New Jersey public policy.  *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 331 n.21 (3d Cir. 2001) (citing *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992)); *Bulut v. JPMorgan Chase Bank, N.A.*, Civ. No. 22-04276, 2023 WL 869402, at *3 (D.N.J. Jan. 27, 2023) (same); *N. Bergen*

---

[8]    Royzenshteyn and Gerashenko do not seek to dismiss OEC's breach of contract claims arising out of the Warrant to Purchase Common Stock and Security Agreement, which are both governed by New Jersey law.  (ECF No. 14-3 at 8, 20.)

*Rex Transp., Inc. v. Trailer Leasing Co.*, 730 A.2d 843, 847-848 (N.J. 1999) (same); *Aguirre v. CDL Last Mile Sols., LLC*, 2024 WL 762467, at *5 (N.J. Super. Ct. App. Div. Feb. 26, 2024) ("[W]hen parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy."); *see also Valcom, Inc. v. Vellardita*, Civ. No. 13-3025, 2014 WL 1628431, at *13 (D.N.J. Apr. 23, 2014); *Curtiss-Wright Corp. v. Rodney Hunt Co.*, 1 F. Supp. 3d 277, 284 (D.N.J. 2014). "Absent a compelling sense of inequity or injustice, courts do not seek to reorder the contracts of private parties." *Instructional Sys., Inc.*, 614 A.2d at 149.

New Jersey courts will decline to enforce a choice-of-law provision only where:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Sullivan v. Sovereign Bancorp., Inc.*, 33 F. App'x 640, 641 (3d Cir. 2002) (quoting *Instructional Sys.*, 614 A.2d at 133); *see also N. Bergen Rex Transp., Inc.*, 730 A.2d at 847-848.

OEC pleads, and Royzenshteyn and Gerashenko do not dispute, that the Stockholders Agreement, the Investor Rights Agreement, and the Stock Purchase Agreement each contain a Delaware choice of law provision. (ECF No. 14-2 at 56, 80, 94.) OEC contends, however, that the parties' agreed-upon choice-of-law provisions do not apply because those provisions do not expressly reference the statute of limitations.

The Court disagrees. OEC relies on the Third Circuit's decision in *Gluck v. Unisys Corporation*, 960 F.2d 1168 (3d Cir. 1992), to support this contention. *Gluck*, however, is distinguishable as it applied the federal conflicts rule for determining the applicable statute of

18

limitations to the plaintiff's non-fiduciary claim under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See Pazymino v. Portfolio Recovery Assocs., LLC*, Civ. No. 19-12259, 2022 WL 17668024, at *5 (D.N.J. Dec. 14, 2022) (distinguishing *Gluck* because "the Court employed the *federal* conflicts rule for determining an applicable statute of limitations").[9] ERISA did not provide a limitations period for the plaintiffs' non-fiduciary claims. *Gluck*, 960 F.2d at 1179. The court, therefore, concluded that it must rely on the limitations period of the claim from the forum state—Pennsylvania—that is "most analogous to the ERISA claim pursued." *Id*. The plaintiffs argued, however, that Michigan law applied to their claims due to the choice-of-law provisions in the contracts at issue. *Id*. The court stated that "[i]f a statute of limitations of a state other than the forum state were implicated in the litigation of [the] federal claim," then the court must apply "federal, not state, choice of law principles." *Id*. In refusing to apply Michigan law to the federal claim, the court reasoned that "[c]hoice of law provisions in contracts do not apply to statutes of limitations, unless the reference is express." *Id*.

Unlike *Gluck*, OEC does not plead a federal cause of action. OEC pursues state contract claims in federal court based on diversity jurisdiction. Thus, the Court applies New Jersey, not federal, conflicts rules. *Pazymino*, 2022 WL 17668024, at *5 ("To resolve a conflict as to the applicable statute of limitations on a contract claim . . . a court, whether federal or state, would look to the conflicts rules of the state in which it sits.") (citing *Maniscalco v. Brother Int'l Corp.*, 709 F.3d 202, 206 (3d Cir. 2013) ("A federal court sitting in diversity jurisdiction must apply the

---

[9]      In addition to *Gluck*, OEC relies on *Jackson v. Chevron Corp. Long-Term Disability Organization, Inc.*, Civ. No. 05-3590, 2006 WL 231595, at *3-4 (D.N.J. Jan. 30, 2006), and *Greene v. Midland Credit Management, Inc.*, Civ. No. 17-1322, 2019 WL 102410, at *3 (D.N.J. Jan. 3, 2019), but both *Jackson* and *Greene* involved federal causes of action—ERISA and Federal Debt Collection Practices Act, respectively. Like *Gluck*, both courts applied federal conflicts rules. *Id*. Thus, both *Jackson* and *Greene* are also distinguishable from this case.

forum state's choice of law rules.")); *see also Chatham Asset Mgmt., LLC v. Adviser Compliance Assocs., LLC*, Civ. No. 23-2677, 2023 WL 8295248, at *3 (D.N.J. Dec. 1, 2023) (finding that statutes of limitations are substantive and federal courts with diversity jurisdiction must apply the relevant state's substantive law, including statute of limitations).  New Jersey law gives effect to the Delaware choice-of-law provisions in the Stockholders Agreement, the Investor Rights Agreement, and the Stock Purchase Agreement, unless the Court finds that Delaware has "no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or the application of Delaware law would be "contrary to a fundamental policy of a state which has a materially greater interest than [Delaware]." *Bulut*, 2023 WL 869402, at *3; *see also Chatham Asset Mgmt., LLC*, 2023 WL 8295248, at *3.

Although OEC has filed a lengthy complaint with many exhibits, the Court does not yet have before it the record necessary to determine whether either of these exceptions apply. Accordingly, the Court will deny Royzenshteyn and Gerashenko's Motion as to the statute of limitations.

## C.    Litigation Privilege

Defendants argue that to the extent that any of OEC's claims arise from their use of the litigation process in the State Court Litigation, the litigation privilege bars them.  (ECF No. 61-1 at 36-39; ECF No. 62-1 at 14-16.)  "The New Jersey litigation privilege ensures that '[s]tatements by attorneys, parties and their representatives made in the course of judicial or quasi-judicial proceedings are absolutely privileged and immune from liability.'"  *Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, 901 F. Supp. 2d 509, 523 (D.N.J. 2012) (quoting *Peterson v. Ballard*, 679 A.2d 657, 659 (N.J. Super. Ct. App. Div. 1996)).  The privilege applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law;

(3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Id*. (quoting *Hawkins v. Harris*, 661 A.2d 284, 289 (N.J. 1995)).

New Jersey's litigation privilege is "expansive," extending to statements made beyond the courtroom, such as private conferences with an attorney regarding litigation. *Id*. (citing *Loigman v. Twp. Comm. of Twp. of Middletown*, 889 A.2d 426, 433 (2006)); *Middlesex Concrete Prods. & Excavating Corp. v. Carteret Indus. Ass'n*, 172 A.2d 22, 25 (N.J. Super. Ct. App. Div. 1961); *see also Mac Naughton v. Harmelech*, 2018 WL 480565, at *2 (N.J. Super. Ct. App. Div. Jan. 19, 2018) (finding that the litigation privilege "certainly protects a litigant engaged in a private conference with an attorney regarding litigation" (internal quotation marks omitted)).

The litigation privilege also protects "statements made in the course of judicial proceedings even if the words are written or spoken maliciously, without any justification or excuse, and from personal ill will or anger." *DeVivo v. Ascher*, 550 A.2d 163, 165 (N.J. Super. Ct. App. Div. 1988). "[T]he trouble with privileges is that they are granted to good and bad alike." *Ritger v. Gatlin*, Civ. No. 09-2688, 2010 WL 1490582, at *3 (D.N.J. Apr. 13, 2010) (quoting *Hawkins*, 661 A.2d at 287). But this approach is necessary for an attorney to "enjoy the utmost freedom of communication to secure justice for his client." *DeVivo*, 550 A.2d at 165. Indeed, the litigation privilege "grows out of the strong public policy 'that persons in such circumstances be permitted to speak and write freely without the restraint of fear'" of tort liability. *Mac Naughton*, 2018 WL 480565, at *2 (quoting *Middlesex Concrete Prods. & Excavating Corp.*, 172 A.2d at 25).

Furthermore, "[c]ourts do not make paper-fine distinctions when analyzing whether a potentially privileged statement 'relates' to a judicial proceeding." *Id*. (quoting *Kanengiser v. Kanengiser*, 590 A.2d 1223, 1233 (N.J. Super. Ct. Law Div. 1991)). Relevancy is interpreted "broadly and liberally." *Devivo*, 550 A.2d at 167 (reasoning that a statement is related "if it has

21

any bearing upon the subject matter of the litigation" and is unrelated only if it is "so wanting in relation to the subject matter of the controversy as that no reasonable man can doubt its relevancy and impropriety") (internal quotation marks omitted)). "[O]therwise[,] the speaker or writer would have to decide the question of [immunity] at his peril, and the sweep of the privilege would be inhibited at the cost of the policy considerations which give it life." *Id.* (quoting *Fenning v. S.G. Holding Corp.*, 135 A.2d 346, 351 (N.J. Super. Ct. App. Div. 1957)).

In addition, courts have applied the privilege to a broad spectrum of tort-related claims. *Giles*, 901 F. Supp. 2d at 523-24 ("The spectrum of legal theories to which the privilege has been applied includes negligence, breach of confidentiality, abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, invasion of privacy, civil conspiracy, interference with contractual or advantageous business relations, and fraud." (internal quotation marks omitted)) (collecting cases).

The Court finds that the New Jersey Supreme Court's recent decision in *Brown v. Brown*, 269 A.3d 1215 (N.J. 2022), is instructive as to the parameters of the litigation privilege. In that case, the plaintiffs filed an action against their deceased father's widow, asserting that her state court complaint and notice of *lis pendens* constituted, among other torts, tortious interference with an existing contractual relationship. *Id.* at 1217-18. To illustrate the reach of the privilege in the case before it, the court provided the following hypothetical:

> For example, had Patricia Brown—in furtherance of her earlier probate action—made a defamatory and malicious statement in the verified complaint or in an affidavit or from the witness stand, that statement would fall within the privilege—so long as it had some relation to the nature of the proceedings,—and a later action by the injured person based on that statement would be vulnerable to the litigation privilege. *But the privilege doesn't immunize Patricia Brown from an action that alleges her earlier suit tortiously interfered with the stepchildren's contract to sell the Burger King property or some other prospective economic advantage. A*

> statement made during that judicial proceeding may be privileged
> but the suit's commencement and prosecution is not. So, we affirm
> the denial of summary judgment based on the privilege but for these
> reasons, not those expressed by the trial judge.

*Id*. at 1220-21 (internal quotation marks and citations omitted) (emphasis added); *see also id*. at 1221 n.9 ("Again, the statements made during the litigation may be covered by the privilege regardless of the label placed on the later action . . . but the act of suing is not protected when the suitor later becomes the target of a tortious interference claim." (citations omitted)). While the *Brown* court did not apply the privilege to commencement and prosecution of the suit, it did apply the privilege to the plaintiff's notice of *lis pendens*. *Id*. at 1221-23. The court reasoned that "a proper notice of lis pendens is a statement or communication of what is alleged in the complaint" about the plaintiff's claim of title to, interest in, or lien upon the described property. *Id*. (finding that the litigation privilege, while it does not protect "the act of filing and maintaining a complaint," it "cloaks" statements made in a complaint).

In viewing the allegations in the light most favorable to OEC, the Court concludes that the core of most of OEC's alleged harms related to the State Court Litigation is the litigation's continued existence and the effect of its pursuit on OEC, not statements made in any filing or to achieve the objects of that litigation. (*E.g.*, ECF No. 6 ¶ 184 ("Ginzburg's pursuit of the State Court Litigation despite [his] obligations [to his client, Onyx] underscores the steps he took to tortiously interfere with OEC's rights and how far he would go to aid the actions of his co-conspirators.").) For example, OEC alleges that "the filing of the State Court Litigation" and "the resulting litigation-related overhang," had "devastating effects on Onyx's business, including its ability to obtain financing and deal partners." (*Id*. ¶¶ 69, 256.) OEC claims that Clearlake did not move forward with the proposed sale of Onyx because the State Court Litigation did not settle. (*Id*. ¶¶ 211-213.) In addition, OEC alleges that the expense to Onyx, a defendant in the State Court

23

Litigation, to defend against the case, resulted in a "reduction in cash available to pay the Accruing Dividend and cash distributions to the stockholders." (*Id*. ¶ 176.)  OEC also claims that Royzenshteyn, as advised by the Ginzburg Defendants, paid himself $400,000 on top of his salary to fund the State Court Litigation. (*Id*. ¶ 235.)  And, according to OEC, the Ginzburg Defendants continued their "conflicted representation" of Royzenshteyn and Gerashenko in the State Court Litigation, "causing Onyx's successor, PARTs iD, to incur continuing costs." (*Id*. ¶ 269.)  OEC even takes issue with the commencement of the first-filed federal action before this Court, claiming that Royzenshteyn and Gerashenko initiated it to continue to extract money from "Onyx-adjacent" entities. (*Id*. ¶ 270.)  But these allegations concerning the commencement of prior litigation and of filing complaints and maintaining claims through the prosecution of a case are not protected by the litigation privilege. *See Brown*, 269 A.3d at 1220-23.

Similarly, the Court finds that Defendants' alleged statements before the State Court Litigation commenced in 2018, particularly those made by the Ginzburg Defendants, are not privileged. *Eng Sales LLC v. RealStuff, Inc.*, Civ. No. 23-04663, 2024 WL 2207559, at *3 (D.N.J. May 14, 2024) ("As to the litigation privilege, when the statements at issue were made before the underlying litigation commenced and not made for the purpose of commencing a lawsuit, the litigation privilege does not apply."); *LY Berditchev, Corp. v. Truss Cosms. Corp.*, Civ. No. 22-04242, 2023 WL 334539, at *7 (D.N.J. Jan. 20, 2023) ("Here, however, these reports were made before this litigation commenced . . . [and] were therefore not made in connection with any judicial proceeding."); *Hotaling & Co., LLC v. LY Berditchev Corp.*, Civ. No. 20-16366, 2022 WL 1134851, at *3 (D.N.J. Apr. 18, 2022) ("The litigation privilege does not protect [pre-suit] communications like Plaintiffs' notice and takedown complaints not sent in connection with a judicial proceeding and not intended to achieve the objects of any litigation." (internal quotation

marks omitted)).  Any argument that these communications were made in contemplation of the State Court Litigation goes beyond the allegations in the Amended Complaint, and the Court will not consider them at this stage.  *Hotaling & Co., LLC*, 2022 WL 1134851, at *3.

The Court concludes, however, that the litigation privilege does apply to certain statements made in furtherance of the State Court Litigation.  Specifically, OEC cannot pursue claims based on statements regarding the removal of Agrawal as the provisional director (ECF No. 6 ¶¶ 183-184, 252); statements made to enjoin OEC from foreclosing on the Collateral under the COI and Security Agreement, (*id.* ¶ 227); statements made in the state court complaint or in the State Court Litigation using information confidential to Onyx (*id.* ¶¶ 167, 184); and statements made to enjoin the Legacy merger (*id.* ¶¶ 252, 263.)  No one claim brought by OEC rests solely on these privileged statements.  Therefore, the Court will not dismiss any of the Counts on this basis.  However, the Court finds that OEC cannot rely on any of the above privileged communications to support its claims.  Accordingly, they are stricken from the Amended Complaint.

### D.  Tortious Interference as to the Ginzburg Defendants

The Ginzburg Defendants argue that the tortious interference claims against them fail because their pursuit of the State Court Litigation was to advance Royzenshteyn and Gerashenko's objectives without malice and that OEC has failed to show proximate cause and damages.  (ECF No. 62-1 at 18-22.)  To prove a claim for tortious interference with a contract, OEC must prove that "(1) [it was] a party to an existing contractual relationship; (2) Defendants intentionally interfered with that contractual relationship; (3) the interference was undertaken with malice; and (4) Plaintiff[] suffered damages resulting from the interference."  *D'Urso v. BAMCO, Inc.*, Civ. No. 22-3723, 2023 WL 5623945, at *6 (D.N.J. Aug. 31, 2023); *Vosough v. Kierce*, 97 A.3d 1150, 1160 (N.J. Super. Ct. App. Div. 2014); *Dello Russo v. Nagel*, 817 A.2d 426, 434 (N.J. Super. Ct. App. Div. 2003); *DiMaria Const., Inc. v. Interarch*, 799 A.2d 555, 560 (N.J. Super. Ct. App. Div.

2001).  "In formulating this definition of the cause of action, New Jersey courts have relied on the Restatement (Second) Torts §§ 766A and 766B."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993); *Nostrame v. Santiago*, 61 A.3d 893, 900-901 (N.J. 2013) (citing the Restatement (Second) Torts § 766 for elements of tortious interference with a contract claim).

"A claim for tortious interference with the performance of a contract must be based, in part, on facts claiming that the interference was done intentionally and with malice."  *Micro Image Techs., Inc. v. Olympus Corp. of the Americas*, Civ. No. 20-18781, 2022 WL 17132156, at *4 (D.N.J. Nov. 22, 2022); *see also* Restatement (Second) of Torts, § 766 cmt. s (1979) (stating that courts frequently express that "malice" is a requirement for claims within the "tortious interference" family).  The interference is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action."  *Micro Image Techs., Inc.*, 2022 WL 17132156, at *4 (quoting Restatement (Second) of Torts § 766A cmt. e (1979)).  The interference is malicious when "the harm was inflicted intentionally and without justification or excuse."  *Id.*; *see also* Restatement (Second) of Torts § 766 cmt. s ("[W]hat is meant is not malice in the sense of ill will but merely 'intentional interference without justification.'").  "'[V]iolence, fraud, intimidation, misrepresentation, criminal or civil threats, and/or violations of the law' constitute malice" as compared to "sneaky or underhanded" acts, which do not.  *D'Urso*, 2023 WL 5623945, at *6 (quoting *Nostrame*, 61 A.3d at 902 (collecting cases)) (internal quotation marks omitted).

As an initial matter, the Court disagrees with OEC that the above articulation of the elements of a claim for tortious interference with an existing contract are incorrect, namely, the "malice" requirement.  New Jersey courts and those interpreting New Jersey law have repeatedly

stated that a tortious interference with contract claim requires a showing of malice.[10]  Indeed, OEC cites no case challenging this longstanding requirement.  *See Megatron Music Mgmt., Inc. v. Energy Bbdo, Inc.*, Civ No. 21-69, 2021 WL 3732900, at \*4 (D.N.J. Aug. 24, 2021) ("While Plaintiff is correct that the word 'malice' is absent from [the Restatement (Second) of Tort] definition, the court [in *Nostrame*] provided no indication that it was deviating from the standard it set forth in [*Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31 (N.J. 1989)]. Since *Sharp*, New Jersey courts have continued to recite 'malice'" as an element of the tort.").

Instead, OEC takes issue with either the procedural posture of certain decisions that cite a malice element or the type of tortious interference claim alleged in those cases.  However, the stage of the case has no bearing on a statement of the elements of a claim.  Furthermore, whether the tortious interference is with an existing or prospective contract, both of which fall within the same family of business torts in the Restatement (Second) of Torts and contain similar elements,[11] the cases cited above all require "malice" to prove tortious interference with an *existing* contract.

---

[10]     *See, e.g.*, *Albee v. Albee*, Civ. No. 21-3984, 2024 WL 625218, at \*15 (E.D. Pa. Feb. 14, 2024); *D'Urso*, 2023 WL 5623945, at \*6; *Micro Image Techs., Inc.*, 2022 WL 17132156, at \*4; *Vosough v. Kierce*, 97 A.3d 1150, 1160 (N.J. Super. Ct. App. Div. 2014); *Dello Russo*, 817 A.2d at 434; *DiMaria Const., Inc.*, 799 A.2d at 560; *East Penn Sanitation, Inc. v. Grinnell Haulers, Inc.*, 682 A.2d 1207, 1218 (N.J. Super. Ct. App. Div. 1996); *see also Calandrillo v. Godaddy.com, LLC*, 2015 WL 2456695, at \*4 (N.J. Super. Ct. App. Div. May 26, 2015); *Larken Assocs., L.L.C. v. P&H Clinton P'ship*, 2012 WL 1537421, at \*14 (N.J. Super. Ct. App. Div. May 3, 2012); *Hopkins v. Duckett*, 2012 WL 124842, at \*13 (N.J. Super. Ct. Jan. 17, 2012); *Weisberger v. N.J. Dep't Cmty. Affairs, Div. of Codes and Standards*, 2009 WL 3170438, at \*5 (N.J. Super. Ct. App. Div. Oct. 2, 2009).

[11]     *1 Reliable Transp., Inc. v. Trader Joe's Co., Inc.*, 2020 WL 4279789, \*1 (N.J. Super. Ct. App. Div. 2020) (finding that "malice" is a "required element of tortious interference with contract and tortious interference with prospective economic advantage"); *see also A. & M. Wholesale Hardware Co., Inc. v. Circor Instrumentation Tech., Inc.*, Civ. No. 13-0475, 2014 WL 714938, at \*8-10 (D.N.J. Feb. 24, 2014).

*See East Penn Sanitation, Inc.*, 682 A.2d at 1218 ("One essential element of a cause of action for tortious interference with a contract is 'malice . . . .'").

Here, OEC claims that the Ginzburg Defendants' actions interfered with the Investor Rights Agreement, the Amended and Restated Certificate of Incorporation, and the Security Agreement.  OEC rests those claims on the following allegations: the Ginzburg Defendants "intentionally, and with no valid justification or excuse" filed the complaint in state court and pursued the State Court Litigation "in a direct attempt to unfairly and materially interfere with OEC's rights and Onyx's obligations" under the Investor Rights Agreement, and "within that State Court Litigation repeatedly sought to enjoin or limit OEC's exercise of its rights"[12] under the Investor Rights Agreement, the COI, and the Security Agreement.  (ECF No. 6 ¶¶ 370, 381, 392; *see also* ECF No 64 at 36.)

The Court dismisses without prejudice OEC's tortious interference claims against the Ginzburg Defendants because OEC has failed to adequately plead malice.  Apart from conclusory statements that the Ginzburg Defendants acted intentionally and without justification or excuse, OEC has failed to sufficiently plead that filing a state court complaint on behalf of a client and prosecuting those claims in furtherance of the client's interests is without justification or excuse. *See Som Maior Audio E Video, Ltda. v. Creston Elecs., Inc.*, Civ. No. 20-19864, 2021 WL 5770259, at *5 (D.N.J. Dec. 3, 2021) (finding that allegations that "parrot the tortious interference legal standard are insufficient").  Accordingly, OEC's pleading falls short of the "rare" or "unusual" circumstance in which a tortious interference claim arising from an attorney-client

---

[12]    To the extent that OEC's tortious interference claims arise from the Ginzburg Defendants' seeking to enjoin OEC from acting in the State Court Litigation, for the reasons stated above, the Court finds that the litigation privilege bars that allegation.

relationship is cognizable.  *Nostrame*, 61 A.3d at 896.[13]  The Court dismisses without prejudice Counts VIII, IX, and X against the Ginzburg Defendants for failure to plausibly plead malice.

### E.  Civil Conspiracy as to the Ginzburg Defendants

The Ginzburg Defendants argue that the Court should dismiss OEC's civil conspiracy claim against them because OEC has failed to plead facts to support the claim and an attorney cannot conspire with his own client.  (ECF No. 62-1 at 23-26.)  The New Jersey Supreme Court permits claims brought by a nonclient against an attorney on "relatively few grounds."  *LoBiondo v. Schwartz*, 970 A.2d 1007, 1029-30 (N.J. 2009) ("[T]here are circumstances, including an attorney's acts to encourage and assist the client in wrongdoing, that could directly injure the nonclient and that would support an independent remedy.").  Civil conspiracy is one such claim. *Id*. (citing *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (finding that "a creditor in New Jersey may bring a claim against one who assists another in executing a fraudulent transfer")).  A civil conspiracy arises when "a combination of two or more persons act[] in concert to commit an unlawful act, or to commit a lawful act by unlawful means."  *Banco Popular N. Am.*, 876 A.2d at 263.  "Civil conspiracy claims under New Jersey law require the plaintiff to plead a viable underlying tort claim."  *Dill v. Yellin*, 725 F. Supp. 3d 471, 484 (D.N.J. 2024) (finding that a breach of contract claim is "not a tort claim and therefore cannot serve as the predicate for a civil conspiracy claim.").

However, as the New Jersey Supreme Court has noted, "[o]ur disciplinary rules and our frivolous litigation sanctions have been effective in controlling the behavior of attorneys, without also permitting anyone to pursue a separate cause of action based thereon."  *LoBiondo*, 970 A.2d

---

[13]    As to proximate cause and damages, the Court need not address these elements as it has already dismissed OEC's tortious interference claims against the Ginzburg Defendants for failure to adequately plead malice.

at 1030.  Indeed, "no New Jersey case has allowed a cause of action based solely on a violation of the [Rules of Professional Conduct]."  *Baxt v. Liloia*, 714 A.2d 271, 275 (N.J. 1998) (collecting cases).

At the outset, the Court will dismiss without prejudice the civil conspiracy claim against the Ginzburg Defendants to the extent that it arises from Royzenshteyn and Gerashenko's alleged breach of fiduciary duties and the Ginzburg Defendants alleged tortious interference with OEC's contracts because the Court has already dismissed those claims without prejudice.  *See A. & M. Wholesale Hardware Co., Inc. v. Circor Instrumentation Tech., Inc.*, Civ. No. 13-0475, 2014 WL 714938, at *11 (D.N.J. Feb. 24, 2014) ("Importantly, a civil conspiracy claim is cognizable only if the underlying offense is also actionable.").  The tortious interference claims against Royzenshteyn and Gerashenko remain.  Thus, the Ginzburg Defendants could be liable for this conduct if found to have conspired with Royzenshteyn and Gerashenko.

The Ginzburg Defendants argue that the "intracorporate conspiracy doctrine" as applied to attorney-client relationships bars the civil conspiracy claim against them because like a corporation and its agent, an attorney cannot conspire with its client.  (ECF No. 62-1 at 25-26.)  The Ginzburg Defendants cite a handful of cases to support this proposition.  However, three of the cases analyze statutory conspiracy claims under federal law and are, therefore, distinguishable.  (*Id.* (citing *Heffernan v. Hunter*, 189 F.3d 405, 412-413 (3d Cir. 1999); *Murray-Nolan v. Rubin*, Civ. No. 22-801, 2022 WL 4104343, at *14 (D.N.J. Sept. 8, 2022); *United States ex rel. Medina v. Stryker Orthopaedics*, Civ. No. 16-2583, 2022 WL 522788, at *9 (D.N.J. Feb. 22, 2022)).)  And the fourth case involves a conspiracy claim under Pennsylvania law.  (ECF No. 62-1 at 25 (citing *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 314 (3d Cir. 2003)).)  The Court must apply New Jersey law on civil conspiracy.

New Jersey courts have reasoned that "[a] corporation which acts through authorized agents and employees . . . cannot conspire with itself." *Sun Pharm. Indus., Inc. v. Core Tech Solutions, Inc.*, 2013 WL 1942619, at *19 (N.J. Super. Ct. App. Div. May 13, 2013); *see also Nat'l Auto Div., LLC v. Collector's All., Inc.*, 2017 WL 410241, at *5 (N.J. Super. Ct. App. Div. Jan. 31, 2017).  But they distinguish the relationship between corporation and employee or agent from that of lawyer and individual client when the lawyer is not acting on behalf of a corporation as its agent or employee.  *Sun Pharm. Indus., Inc.*, 2013 WL 1942619, at *19 (finding that *Banco* is "factually dissimilar" because "lawyers were alleged to have engaged in civil conspiracies with their individual clients; they were not acting on behalf of a corporation as its employee or agent"); *see also Ojo v. Milrose 179 Harrison, LLC*, 2021 WL 822788, at *11 n.7 (distinguishing lawyers representing individual clients in *Banco* from a law firm representing a corporate client).  Indeed, as the New Jersey Supreme Court has held, an attorney's representation of a client "does not insulate him from liability."  *Banco Popular N. Am.* 876 A.2d at 263.  The attorney-client relationship at issue here is between the Ginzburg Defendants and Royzenshteyn and Gerashenko as individuals.  Thus, New Jersey's version of the "intracorporate conspiracy doctrine" does not shield the Ginzburg Defendants from a civil conspiracy claim.

The Court finds that OEC has satisfied the pleading requirements of civil conspiracy as related to the tortious interference claims against Royzenshteyn and Gerashenko.  No party challenges the plausibility of this specific tortious interference claim.  Thus, the Court concludes that OEC has sufficiently pled "unlawful conduct" for purposes of civil conspiracy.  *E.g., A. & M. Wholesale Hardware Co., Inc.*, 2014 WL 714938, at *11 ("[The plaintiff]'s tortious interference claims are adequately pled and thus, its civil conspiracy claims are cognizable.").

31

Regarding concerted action, OEC alleges that Royzenshteyn and Gerashenko acted "in their own personal interests" by "misappropriating funds to pay Performance Bonuses and excess compensation"; by "refusing to provide the financial information and reporting to which OEC was entitled"; by "denying inspection rights"; by "causing Onyx to fail to pay the Accruing Dividend"; by "refusing to pay the Liquidation preference"; by "seeking to enjoin OEC from exercising its rights under the COI";[14] and by "causing Onyx to breach the COI as relates to paying the Redemption Price to OEC." (ECF No. 6 ¶¶ 369, 380, 391.) OEC links this conduct generally to a "strategy of obstruction" that was "recommended" by the Ginzburg Defendants and "implemented by Royzenshteyn and Gerashenko based on [the Ginzburg Defendants'] legal advice . . . and as part of Ginzburg's overall strategy regarding the State Court Litigation." (*Id.* ¶ 190; *see also id.* ¶ 399 ("[Defendants] entered into an agreement . . . to conduct a campaign of attrition in an effort to remove OEC and its designees from Onyx."); *id.* ¶ 155 ("Ginzburg . . . based on an agreement between the three, took active and material steps on their behalf . . . in an attempt to remove OEC and its appointed directors and in a concerted effort to unwind the 2015 Transaction.").) OEC also alleges that the Ginzburg Defendants' "concocted and advised" a strategy that included Royzenshteyn paying himself $400,000 "to help fund the State Court Litigation." (*Id.* ¶ 235.) The Court finds that OEC has sufficiently pled concerted action to survive a motion to dismiss at this stage.

In sum, the Court dismisses without prejudice the civil conspiracy claim (Count XI) against the Ginzburg Defendants to the extent that it relies on Royzenshteyn and Gerashenko's alleged breaches of fiduciary duty and the Ginzburg Defendants' alleged tortious interference with OEC's contracts. The civil conspiracy claim (Count XI) against the Ginzburg Defendants will survive

---

[14]    As discussed above, this allegation is barred by the litigation privilege.

dismissal as to Royzenshteyn and Gerashenko's alleged tortious interference with OEC's contracts.

### F. Aiding and Abetting

Royzenshteyn and Gerashenko argue that the Court must dismiss OEC's aiding and abetting claim (Count XII) to the extent that it is premised on breach of contract as such a claim is not cognizable under New Jersey law. (ECF No. 61-1 at 42-43.) In the alternative, Royzenshteyn and Gerashenko assert that OEC's claim for aiding and abetting a breach of contract is barred by the economic loss doctrine. (*Id.* at 43.)

New Jersey law clearly recognizes an aiding and abetting cause of action when that claim is predicated on another tort, such as fraud or breach of a fiduciary duty. *E.g.*, *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 415 (3d Cir. 2003) (recognizing under New Jersey law a claim of aiding and abetting fraud); *Bondi v. Citigroup, Inc.*, 2005 WL 975856, at *18 (N.J. Super. Ct. Law Div. Feb. 28, 2005) ("[T]he multiple factual scenarios illustrated in the complaint present viable claims for relief under a theory of aiding and abetting breaches of fiduciary duties."). What is not clear is whether that recognition extends to aiding and abetting predicated on a contract claim. *Dill*, 725 F. Supp. 3d at 484 ("New Jersey law is unclear on whether aiding and abetting requires a tort-based predicate like civil conspiracy.").[15]

However, the Court need not determine whether such a claim is cognizable under New Jersey law because it agrees with Royzenshteyn and Gerashenko that Count XII is barred by the

---

[15]    *See Valiant Consultants Inc. v. FBA Support LLC*, Civ. No. 21-12047, 2022 WL 2803104, at *9 (D.N.J. July 18, 2022) ("[T]he Court is unaware of a standalone claim for 'aiding a third party with breaching a contract' under New Jersey or federal law."). *But see King's Choice Neckwear, Inc. v. Fedex Corp.*, Civ. No. 07-0275, 2007 WL 4554220, at *3 (D.N.J. Dec. 21, 2007) (permitting the plaintiff to proceed with its claim for aiding and abetting a breach of contract because "New Jersey recognizes civil conspiracy and aiding and abetting as valid causes of action").

economic loss doctrine to the extent that it arises from a breach of contract. "The economic loss doctrine prevents plaintiffs 'from recovering in tort economic losses to which their entitlement flows only from a contract.'" *Dill*, 725 F. Supp. 3d at 484-85 (quoting *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002)); *see also Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002) ("[A] tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law.").

Absent the contracts at issue, Defendants would have no duty to refrain from aiding and abetting any contractual violations. *Dill*, 725 F. Supp. 3d at 484-85. OEC contends, however, that to dismiss any aiding and abetting breach of contract claim based on the economic loss doctrine would be "premature" because Defendants have not admitted to the existence of a contract. This argument is unavailing, as without a contract, OEC would have no grounds to pursue an aiding and abetting claim based on a breach of contract. In short, OEC seeks to recover losses from Defendants for aiding and abetting a breach of contract. OEC's entitlement to those losses flows only from a contract. *Id.* Therefore, the economic loss doctrine bars the claim, and the Court dismisses Count XII to the extent that it relies on a breach of contract.

Since the Court has dismissed without prejudice the breach of fiduciary duty claims against Royzenshteyn and Gerashenko and the tortious interference claims against the Ginzburg Defendants, the Court will also dismiss without prejudice the claim for aiding and abetting (Count XII) predicated on those Counts (I, II, III, IV, VIII, and X).

### G. Prima Facie Tort

Finally, Defendants challenge OEC's prima facie tort claim, arguing that New Jersey law does not recognize any such claim. (ECF No. 61-1 at 43-44; ECF No. 62-1 at 29-32.) The Restatement (Second) of Torts provides that a person may be liable in tort, "although the actor's conduct does not come within a traditional category of tort liability," if that person "intentionally

causes injury to another" and "his conduct is generally culpable and not justifiable under the circumstances." *Taylor v. Metzger*, 706 A.2d 685, 700 (N.J. 1998) (internal quotation marks omitted).

The New Jersey Supreme Court has declined to address whether New Jersey law recognizes a cause of action for prima facie tort. *Taylor*, 706 A.2d at 701 ("We decline in this case to recognize a claim for prima facie tort."); *Richard A. Pulaski Const. Co. v. Air Frame Hangars, Inc.*, 950 A.2d 868, 876 (N.J. 2008) ("Because a prima facie tort cause of action, however defined, may lie only if no other tort is available, we need not address whether New Jersey recognizes that tort or otherwise defines its contours."); *see also Sciore v. Phung*, Civ. No. 19-13775, 2022 WL 17446505, at *1 (D.N.J. Dec. 6, 2022) ("[P]rima facie tort ha[s] not been officially recognized in New Jersey . . . ."); *Fed. Nat'l Mortg. Ass'n v. DuBois*, Civ. No. 15-3787, 2018 WL 5617566, at *13 (D.N.J. Oct. 30, 2018) (same).

Nevertheless, courts have reasoned that, were it recognized in New Jersey, a prima facie tort cause of action "would encompass the 'intentional, willful and malicious harms' that fall within the gaps of the law" and would be permitted "only in the limited situations in which plaintiffs would have no other causes of action." *Taylor*, 706 A.2d at 701; *Pulaski Const. Co.*, 950 A.2d at 876; *iPurusa, LLC v. Bank of New York Mellon Corp.*, Civ. No. 22-00966, 2022 WL 16834601, at *11 (D.N.J. Nov. 9, 2022). "Where relief may be afforded under traditional tort concepts, prima facie tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort." *Pulaski Const. Co.*, 950 A.2d at 876 (internal quotation marks omitted). In other words, "prima facie tort should not become a 'catch-all' alternative for every cause of action which cannot stand on its own legs." *Id.* (internal quotation marks omitted); *Taylor*, 706 A.2d at 701 ("Prima facie tort should not be invoked when the

essential elements of an established and relevant cause of action are missing."); *Ciemniecki v. Parker McCay P.A.*, Civ. No. 09-6450, 2010 WL 2326209, at *15 (D.N.J. June 7, 2010) ("[T]he availability of the prima facie tort doctrine is limited exclusively to those instances of intentional and culpable conduct unjustified under the circumstances that, as a threshold matter, do not fall within a traditional tort cause of action." (internal quotation marks omitted)).

While the Court agrees that New Jersey has not officially recognized prima facie tort as a cause of action, the Court will dismiss OEC's prima facie tort claim on the basis that OEC asserts numerous causes of action in the Amended Complaint encompassing the same conduct. OEC cannot rely on its prima facie tort claim as a "catch-all" to save deficient claims when the conduct of which it complains falls within the more traditional tort claims that it has already pled. *Taylor*, 706 A.2d at 701. The Court, therefore, dismisses Count XIII.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, and other good cause shown, Defendants' Motions to Dismiss (ECF Nos. 61, 62) are **GRANTED** in part and **DENIED** in part.

Counts I, II, III, and IV against Royzenshteyn and Gerashenko are **DISMISSED** without prejudice in their entirety. Count XII against Royzenshteyn and Gerashenko is **DISMISSED** without prejudice as to breaches of fiduciary duty. Count XII against Royzenshteyn and Gerashenko is **DISMISSED** with prejudice as to breaches of contract only. Count XIII against Royzenshteyn and Gerashenko is **DISMISSED** with prejudice in its entirety.

Counts VIII, IX, and X against the Ginzburg Defendants are **DISMISSED** without prejudice in their entirety. Count XI against the Ginzburg Defendants is **DISMISSED** without prejudice as to breaches of fiduciary duty and the Ginzburg Defendants' tortious interference with contracts only. Count XII against the Ginzburg Defendants is **DISMISSED** without prejudice as to breaches of fiduciary duty and tortious interference with contracts. Count XII against the

Ginzburg Defendants is **DISMISSED** with prejudice as to breaches of contract only.  Count XIII against the Ginzburg Defendants is **DISMISSED** with prejudice in its entirety.

The Motions are **DENIED** in all other respects, and the remaining counts of the Amended Complaint shall proceed.

An appropriate Order follows.

Dated: January 8, 2025

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**